**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **GARY ALLEN SORENSON,** | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| **W. RALPH BASHAM,** *et al.,* | ) |
| | ) |
| Defendants. | ) |
| | ) |

Civil Action No. 07-0422 (RMC)

**FEDERAL DEFENDANTS' MOTION TO DISMISS**

Federal Defendants, by and through their attorney, the United States Attorney for the District of Columbia, respectfully move this Court to dismiss this case, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.  This motion is based on the accompanying Memorandum of Points and Authorities, supporting Declarations of the Federal Bureau of Investigation ("FBI") and the United States Customs and Border Protection ("USCBP"), and the attached Exhibit: United States Citizenship and Immigration Services ("USCIS or CIS") Fact Sheet, "Immigration Security Checks – How and Why the Process Works." A proposed Order is also attached.

Respectfully  submitted,

_____Jeffrey A. Taylor_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

_____Rudolph Contreras_____
RUDOLPH CONTRERAS, D.C. BAR #  434122
Assistant United States Attorney

_____s/Sherease Louis_____
SHEREASE LOUIS
Special Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **GARY ALLEN SORENSON,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 07-0422 (RMC) |
| | ) | |
| **W. RALPH BASHAM,** *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF MOTION TO DISMISS**

Federal Defendants, U.S. Customs and Border Protection ("CBP"), U.S. Department of

Homeland Security ("DHS"), and Federal Bureau of Investigation ("FBI"), respectfully move to

dismiss the Complaint for Mandamus filed by the Plaintiff in the above-captioned matter,

pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), for lack of subject matter jurisdiction, and for

failure to state a claim upon which relief can be granted.

**STATEMENT OF FACTS**

Plaintiff, Gary Allen Sorenson, is a citizen of Canada.  Compl. ¶ 10.  Plaintiff alleges that

on September 11, 2004, he was found to be inadmissible to the United States pursuant to 8

U.S.C. § 1182(a)(2)(A)(i), based on two theft convictions.  Compl. ¶ 12.  Plaintiff subsequently

sought admission as a visitor to the United States on November 16, 2005.  At that time, due to

CBP's determination that Plaintiff was inadmissible to the United States, based upon his prior

criminal convictions, Plaintiff applied for a waiver of inadmissibility, pursuant to 8 U.S.C. §

1182(d)(3)(B).   As part of the application process, Plaintiff submitted by submitting Form I-192,

along with supporting evidence to CBP at the Port of Buffalo, New York, and paid the $265

application fee.  Compl. ¶ 13, Decl. of Richard J. McCabe,  ¶ 17.  Two months later, on January

16, 2006, CBP found Plaintiff's application to be deficient, as Plaintiff failed to submit all the necessary documentation. CBP provided Plaintiff with the opportunity to submit the required information, informing him that otherwise his application would be denied for lack of initial evidence. Compl. ¶ 14, McCabe Decl. ¶ 20. CBP's request specifically advised Plaintiff that the required documentation needed to be sent to CBP by April 15, 2006. McCabe Decl. ¶ 20, Compl., Exhibit 2. Nearly five (5) months later, in a letter dated May 8, 2006, Plaintiff, through counsel, provided the requested information. *Id.* ¶ 21.

Despite Plaintiff's own five month delay in forwarding the requested information to CBP, which prevented the Defendants from being able to timely and properly process Plaintiff's application, Plaintiff now seeks Mandamus relief against the Defendants, seeking to compel Defendants to adjudicate Plaintiff's application for waiver of inadmissibility. *See* Compl. at ¶ 2. Plaintiff argues that this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1361, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 555(b) and 702, and the Immigration and Nationality Act ("INA"), and its related regulations.

## ISSUE PRESENTED

The issue is whether an applicant for a waiver of inadmissibility under INA § 212(d)(3), has presented this Court with a justiciable action. Alternatively, the issue is whether, given that the waiver process is committed to the sole discretion of the Attorney General, this Court has jurisdiction. Because the waiver process is committed to the sole discretion of the Attorney General, this Court has no jurisdiction. The Court should therefore dismiss the Complaint.

## STANDARD OF REVIEW

The standard to be applied in deciding a motion to dismiss is well-established. For purposes of deciding whether a Plaintiff has failed to state a cause of action, the factual

allegations of the complaint must be taken as true, and all ambiguities or doubts in the factual allegations must be resolved in favor of the pleader. *Caudle v. Thomason*, 942 F.Supp. 635, 638 (D. D.C. 1996). Despite this generous standard, the complaint still must set forth sufficient factual information to suggest that there exists some recognized legal theory upon which relief can be granted. *Id.* A court must dismiss a complaint where, even assuming all the factual allegations are true, Plaintiff has failed to establish a right to relief based upon those facts. *Id.*

A.    **Dismissal Under Rule 12(b)(1)**

Under controlling law, mandamus is an inappropriate remedy for the relief sought by Plaintiff and does not confer subject matter jurisdiction on this Court under 28 U.S.C. § 1361. Neither the APA nor the INA, in conjunction with 28 U.S.C. § 1331, provides an independent basis for the Court's subject matter jurisdiction. Accordingly, Plaintiff's Complaint must be dismissed under the Federal Rule of Civil Procedure 12(b)(1).

Federal courts are courts of limited jurisdiction and those limits, whether imposed by the Constitution or by the Congress, cannot be "disregarded or evaded." *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978); see also, *Bowman v. White*, 388 F.2d 756, 760 (4th Cir. 1968)("Federal courts are courts of limited jurisdiction and are empowered to act only in those specific instances authorized by Congress") *(citing, McNutt v. General Motors Acceptance Corporation*, 290 U.S. 178 (1935)). Thus, a federal court is presumed to lack jurisdiction in a particular case unless affirmatively proven otherwise. *Renne v. Geary*, 501 U.S. 312, 316 (1991). It is the Plaintiff who bears the burden of establishing the court's subject matter jurisdiction. "The burden is on the party asserting the jurisdiction of the court to show that jurisdiction does, in fact, exist." *Bowman*, 388 F.2d at 760. *See also Miller v. United States*,

710 F.2d 656, 662 (10th Cir.), *cert. denied*, 464 U.S. 939 (1983); *Baird v. United States*, 653

F.2d 437, 440 (10th Cir. 1981), *cert. denied*, 454 U.S. 1144 (1982).

In deciding a motion under Rule 12(b)(1), the Court may go beyond the allegations of the

Complaint.  *See Land v. Dollar*, 330 U.S. 731, 735 n. 4 (1947); *Herbert v. National Academy of*

*Sciences*, 974 F.2d 192, 197-98 (D.C. Cir. 1992); *Haase v. Sessions*, 835 F.2d 902, 906 (D.C.

Cir. 1987); *Bonterra America, Inc. v. Bestmann*, 907 F.Supp. 4, 5 n.1 (D.D.C. 1995); *Kuffel v.*

*United States Bureau of Prisons*, 882 F. Supp. 1116, 1120 (D.D.C. 1995).  When a defendant

challenges subject matter jurisdiction pursuant to Rule12(b)(1), "the district court is to regard the

pleadings as mere evidence on the issue, and may consider evidence outside the pleadings

without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg &*

*Potomac R. Co. v. United States,* 945 F.2d 765, 768 (4th Cir. 1991); *see also Baker v. Henderson*,

150 F. Supp.2d 17, 19 n. 1 (D.D.C. 2001) ("in determining whether a complaint fails to state a

claim, the court may take judicial notice of matters of a general public nature, such as court

records, without converting the motion to dismiss into one for summary judgment.");

*Himmelman v. MCI Communications*, 104 F.Supp.2d 1, 3 (D.D.C. 2000) ("[t]he court may

consider [on a motion to dismiss] the allegations of the complaint, documents attached to or

specifically referred to in the complaint, and matters of public record.").  This is so because a

motion under Rule 12(b)(1) "calls into question the court's power to hear the plaintiff's claim ...

and therefore imposes upon courts an affirmative obligation to ensure that they are acting within

the scope of their jurisdictional power." 5A Wright & Miller, Federal Practice & Procedure 2d §

1350; *see also District of Columbia Retirement Bd. v. United States*, 657 F.Supp. 428, 431

(D.D.C.1987).  Accordingly, the Court need not limit itself to the allegations of the Complaint in

deciding a 12(b)(1) motion.  Instead, "the Court may consider the complaint supplemented by

4

undisputed facts evidenced in the record . . . plus the court's resolution of disputed facts."

*Herbert v. National Acad. of Sciences*, 974 F.2d 192, 197 (D.C. Cir.1992).

### B.    Dismissal Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) should be granted only if "it appears beyond

doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle

[her] to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  In making determinations on a

motion to dismiss under Rule 12(b)(6), a court must view facts alleged in the complaint in the

light most favorable to the Plaintiff. *Id.; see also Nix v. Hoke*, 139 F.Supp.2d 125, 131 (D.D.C.

April 2001) (citing, *Weyrich v. The New Republic, Inc.*, 235 F.3d 617, 623 (D.C. Cir. 2001)), and

*Slaby v. Fairbridge*, 3 F. Supp. 2d 22, 27 (D.D.C. 1998).  In this case, Plaintiff fails to establish a

right to relief on the claims asserted, even when accepting the facts he alleges as true.

## ARGUMENT

### I.    Plaintiff's Complaint Should be Dismissed Because this Court Lacks Subject Matter Jurisdiction Pursuant to 8 U.S.C. § 1252(a)(2)(B)(ii).

As acknowledged by Plaintiff in his Complaint, "Section 242(a)(2)(B) of the INA, 8

U.S.C. § 1252(a)(2)(B), *as amended* by the REAL ID Act of 2005, Pub. L. No. 109-13 (May 11,

2005), eliminated the authority of the federal courts to review decisions by the government to

grant or deny discretionary relief.  Specifically, subsection (ii) of § 242(a)(2)(B) provides that

"no court shall have jurisdiction to review . . . (ii) any other decision or action of the Attorney

General or the Secretary of Homeland Security the authority for which is specified under this

subchapter to be in the discretion of the Attorney General or the Secretary of Homeland

Security . . . ." 8 U.S.C. § 1252(a)(2)(B)(ii)."  Compl. ¶ 4.  Nevertheless, Plaintiff attempts to

distinguish his circumstances by arguing that he is only "challenging the government's failure to

*adjudicate* his application for a waiver of inadmissibility in the first instance" that is, "a duty to

process and adjudicate his application for a waiver of inadmissibility" . . . within a reasonable time.  Compl. ¶ 4, 7, 8; *see* 8 U.S.C. § 1103.  For the following reasons, this argument, too, must fail.

## II.    28 U.S.C. § Is Inapplicable to Discretionary Functions.

The adjudication process of non-immigrant waiver applications is made pursuant to Section 212(d)(3) of the Immigration and Nationality Act (INA).  Section 212(d)(3) of the INA provides that certain aliens who have been deemed  inadmissible to the United States as non-immigrants may apply for advance permission to enter the United States.  *See* INA § 212(d)(3).  Such non-immigrant Canadian citizens who have been deemed inadmissible to the United States may make application for a waiver of inadmissibility, pursuant to INA § 212(d)(3), in person, with "Form I-192," at a U.S. port of entry.  McCabe Decl. ¶ 4.  As set forth at INA § 212(d)(3), the granting of such waivers is within the discretion of the Attorney General.

District courts and appellate courts alike have routinely found that judicial relief is unavailable to compel discretionary relief by the Attorney General.  *See, e.g., Safadi v. Howard*, 466 F. Supp.2d 696, 700 (E.D.Va. 2006); *Keane v. Chertoff*, 419 F.Supp.2d 597, 599-600 *(S.D.N.Y. 2006); Saleh v. Ridge, 367 F. Supp.2d 508, 511 (S.D.N.Y. 2005); Karan* v. McElroy, 2003 WL 21209769, at * 1 (S.D.N.Y.2003); *Zheng v. Reno*, 166 F. Supp. 2d 875, 880-81 (S.D.N.Y. 2001); *Sadowski v. INS*, 107 F. Supp.2d 451, 453 (S.D.N.Y. 2000); *Rahman v. McElroy*, 884 F. Supp. 782, 787 (S.D.N.Y. 1995); *Rodrigues-Nascimento v. Gonzales*, --- F.3d ----, 2007 WL 1345994 (C.A.1,2007); *Mehilli v. Gonzáles*, 433 F.3d 86, 93 (1st Cir. 2005) (*quoting Vasile v. Gonzáles*, 417 F.3d 766, 768 (7th Cir. 2005)); *Bencosme de Rodríguez v. Gonzáles*, 433 F.3d 163, 164 (1st Cir.2005)(no judicial review for Attorney General's discretionary waiver decisions.)

Not only does the statute vest the Attorney General with exclusive and discretionary authority to grant such waiver applications, which Plaintiff does not dispute, it also does not place any time restriction upon the Attorney General to do so.  In fact, there are no statutes or regulations that provide a time limitation within which the Department of Homeland Security, the Attorney General, CBP, USCIS, or the FBI must act to approve or deny a waiver application. And as held in *Grinberg v. Swacina,* 478 F.Supp.2d (S.D. Fla. 2007)*,* the INA precludes judicial review of any discretionary decision or action of the Attorney General in immigration matters, "includ[ing] the pace at which immigration decisions are made."  This proposition was also recognized in *Safadi v. Howard*, where the district court found that Congress vested the Secretary of Homeland Security with complete discretion over the process of adjudicating immigration applications, including the process of reviewing the application and the pace at which it proceeds.  466 F. Supp.2d 696, 698-700 (E.D. Va. 2006)(quoting *Zheng v. Reno*, 166 F. Supp.2d 875, 880 (S.D.N.Y. 2001) for the proposition that the adjustment process is "wholly discretionary.").  In the context of adjudicating waiver applications, the Attorney General may direct any necessary investigation of an applicant.  *See* 8 C.F.R. § 103.2(b)(7), and may withhold an adjudication pending completion of any investigation(s), including any necessary national security screenings.

Shortly after September 11, 2001, USCIS and the FBI responded to even greater national security concerns and provided for a more stringent security check review of all immigration applications.  The agencies have expanded the criteria from ordinary criminal background investigations to matters of national security to determine whether there are any criminal or security-related issues in the applicant's background that would affect his eligibility for any immigration benefits.  Thus, after an alien submits an application, whether for waiver of

inadmissibility (Form I-192) or adjustment of status (Form I-485), USCIS, in conjunction with

the FBI, conducts several forms of security checks to ensure that the alien is eligible for the

benefit and that he is not a risk to national security or public safety. McCabe Decl. ¶ 10.   These

checks currently include: 1) an FBI fingerprint check for relevant criminal history records on the

alien; 2) a check against the Interagency Border Inspection System (IBIS), which is managed by

the Department of Homeland Security (DHS) and contains records and "watch list" information

from more than twenty federal law enforcement and intelligence agencies; and 3) an FBI name

check, that is run against FBI investigative databases containing information that is not

necessarily revealed by the FBI's fingerprint check or IBIS. Id.   See 8 U.S.C. § 1105(a)

(authorizing "direct and continuous liaison with the Directors of the Federal Bureau of

Investigation and the Central Intelligence Agency and with other internal security officers of the

Government for the purpose of obtaining and exchanging information for use in enforcing the

provisions of this chapter in the interest of the internal and border security of the United States").

### III.    Mandamus May Not Issue Here Because the Plaintiff Lacks a Clear Right to an Immediate Waiver of Inadmissibility.

The common law writ of mandamus, as codified in 28 U.S.C. § 1361, provides that "the

district courts shall have original jurisdiction of any action in the nature of mandamus to compel

an officer or employee of the United States or any agency thereof to perform a duty owed to the

plaintiff."  Courts have consistently recognized that "the remedy of mandamus is a drastic one, to

be invoked only in extraordinary situations" to relieve a clearly deserving plaintiff only if he has

exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary

duty. *See Allied Chemical Corp. V. Daiflon, Inc.*, 449 U.S. 33, 34 (1980); *Chatman-Bey v.*

*Thornburgh*, 864 F.2d 804, 806 n. 2 (D.C. Cir. 1988); *Kerr v. U.S. Dist. Ct. for N.D. Cal.*, 426

U.S. 394, 402-403 (1976).  It is granted only when essential to the interests of justice.  *See*

*Starnes v. McGuire*, 512 F.2d 918, 929 (D.C. Cir. 1974)(en banc); *Haneke v. Secretary of HEW*, 535 F.2d 1291, 1296 (D.C. Cir. 1976); *In Re Tripati*, 836 F.2d 1406, 1407 (D.C. Cir. 1988).

While a federal district court has authority to issue a writ of mandamus pursuant to 28 U.S.C. § 1361, its issuance is not required; rather, mandamus is issued at the discretion of the Court. *National Wildlife Federation v. United States*, 626 F.2d 917, 923 (D.C. Cir. 1980). It may only issue if three elements are met: 1) the petitioner has shown a clear and indisputable right to the relief sought; 2) the respondent has a clear nondiscretionary duty to do the particular act requested by the petitioner; and 3) no other adequate remedy is available. *See In re Diet Drugs*, 418 F.3d 372, 378-79 (3d Cir. 2005) (Alito, J.).

The relief sought in this case is the prompt adjudication of Plaintiff's waiver application. Plaintiff is not entitled to mandamus relief with respect to this request, however, because he has not demonstrated that he has a clear right to an immediate waiver of inadmissibility. Defendants owe no clear duty to adjudicate Plaintiff's application prior to the completion of background checks for criminal convictions and national security matters. *See Maldonaldo-Coronel v. McElroy*, 943 F.Supp. 376, 384-85 (S.D.N.Y. 1996); *Zheng v. INS*, 933 F. Supp. 338, 241 (S.D.N.Y. 1996).

Thus, because Plaintiff identifies no "right" to immediate adjudication of his application, and certainly no "clear or certain" right thereto, and Defendants' actions are discretionary rather than ministerial, Plaintiff has failed to demonstrate that he is entitled to mandamus relief. *Northern States Power Co. V. U.S. Dep't of* Energy, 128 F.3d 754, 758 (D.C.Cir. 1997); *Ganem v. Heckler*, 746 F.2d 844, 852 (D.C. Cir. 1984); *accord In Re Lane*, 801 F.2d 1040, 1042 (8th Cir. 1986); *Homewood Professional Care Center, Ltd. v. Heckler*, 764 F.2d 1242, 1251 (7th Cir.

1985); *Jones v. Alexander*, 609 F.2d 778 (5th Cir. 1980); *Billiteri v. U.S. Board of Parole*, 541

F.2d 938 (2nd Cir. 1976).

     It is clear that the requirement of a duty to act has been interpreted to mean that the duty

of the federal officer sued must be "ministerial, plainly defined and peremptory." *Jeno's Inc. v.*

*Commissioner of Patents and Trademarks*, 498 F. Supp. 472, 476 (D. Minn. 1980).  The act

sought to be compelled must be "a clear nondiscretionary duty."  *Pittston Coal Group v. Sebben*,

109 S. Ct. 414, 424 (1988).  *Accord, Nova Stylings, Inc. v. Ladd*, 695 F.2d 1179 (9th Cir. 1983);

*Welch v. Donovan*, 551 F. Supp. 809 (D.D.C. 1982).  "It is well settled that a writ of mandamus

is not available to compel discretionary acts."  *Cox v. Secretary of Labor*, 739 F. Supp. 28, 30

(D.D.C. 1990)(citations omitted).

     For these reasons, district courts have routinely found that mandamus relief is

unavailable to compel immediate adjudication of applications for immigration benefits.  *See,*

*e.g., Li v. Chertoff et al.*, 2007 U.S. Dist. LEXIS 29766 (April 2, 2007)(motion to dismiss

granted based upon lack of subject matter jurisdiction in mandamus action regarding delayed

adjudication of I-485 application); *Safadi v. Howard*, 466 F. Supp. 2d 696, 698-700 (E.D. Va.

2006)(finding no jurisdiction to review discretionary pace of adjustment application

adjudications); *Zheng v. Reno*, 166 F. Supp.2d 875, 880-81 (S.D.N.Y. 2001)("[m]atters within

the INS's discretion are not reviewable under the mandamus statute"); *Zaytsev v. Gantner et al.*,

2004 U.S.Dist. LEXIS 28632 (S.D.N.Y. 2004)(denial of mandamus relief to expedite

adjudication).  Clearly, Plaintiff cannot demonstrate that defendants owe him a nondiscretionary

duty.

**IV.    There is No Jurisdiction Under the APA**

The APA does not entitle a person "adversely affected or aggrieved by agency action" to judicial review where another statute precludes judicial review or "*agency action is committed to agency discretion by law." See 5 U.S.C. § 701(a)(2); Brock* v. Pierce County, 476 U.S. 253, 260 n.7 (1986). Section 701(a)(2) precludes judicial review over Plaintiff's claims because the adjudication of waiver of inadmissibility applications is committed to agency discretion. This Court should therefore deny Plaintiff's claim.

The APA itself does not confer jurisdiction on a district court to review the decision of an administrative agency. *See Califano v. Sanders*, 430 U.S. 99, 107 (1977). However, a district court may have subject matter jurisdiction under 28 U.S.C. § 1331 over a claim that an agency has violated the APA if the claim is not "wholly insubstantial and frivolous" or "patently without merit." *See Bell v. Hood*, 327 U.S. 678, 682-84 (1946). Even where subject matter jurisdiction to review an APA claim exists, however, a claim nevertheless may not be reviewed by the courts if the relevant agency action is "committed to agency discretion by law." See 5 U.S.C. § 701(a)(2). "Agency action" is defined under the APA to include a "failure to act." *See* 5 U.S.C. § 551(13).

In *Heckler v. Chaney*, 470 U.S. 821 (1985), the Supreme Court interpreted 5 U.S.C. § 701(a)(2) to mean that "review is not to be had if the statute is drawn so that the court would have no meaningful standard against which to judge the agency's exercise of discretion." Id. at 830. As the Court went onto explain, "if no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'" Id. (emphasis added); *see also Jilin Pharm. USA*, Inc., 447 F.3d at 204-05. In addition, at least two Supreme Court cases suggest the importance of a specified time period in allowing a court to compel agency action that is "unreasonably

11

delayed" under section 706(1). *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 65 (2004).

 As explained above, the adjudication of waivers of inadmissibility and adjustment of status applications is expressly committed to agency discretion. See 8 U.S.C. § 1255(a). Moreover, no statutory or regulatory provisions provide a "meaningful standard" against which to measure the Attorney General's process of adjudicating such an application. *See Heckler*, 470 U.S. at 830. Rather, the agency maintains complete discretion to determine not only whether to adjudicate the application, but also when to do so. *Id.* The statute and regulations governing Plaintiffs' application provide no time frame for when such an application must be adjudicated. *See Zheng*, 166 F. Supp. 2d at 879 ("[T]here is no requirement that the application be decided within a specific period of time[.]"). Consequently, there is no standard against which the Court can measure whether the Agency has acted "within a reasonable time," 5 U.S.C. § 555(b), or "unreasonably delayed" adjudication. See 5 U.S.C. § 706(1). For these reasons, other courts have found that claims relating to alleged delays in the process of adjudicating an adjustment of status application are unreviewable under the APA. *See Zheng*, 166 F. Supp.2d at 878-89; *Karan*, 2003 WL 21209769, at *1 (S.D.N.Y. 2003) ("[B]ecause decisions regarding the plaintiffs immigration status are committed to the discretion of the INS, this Court lacks the authority under...the APA to grant the relief the plaintiff seeks."); *Rahman v. McElroy*, 884 F. Supp. 782, 787-88 (S.D.N.Y. 1995). Moreover, as other courts have cautioned, in "matters solely within the INS's discretion[,] ...aside from our powerlessness to intervene, the judicial creation of such a duty would have the potential for mischievous interference with the functioning of already overburdened administrative agencies." *See Rahman*, 884 F. Supp. at 787 (internal quotes omitted); *see also Heckler*, 470 U.S. at 831-82 (noting that "[t]he agency is far

better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities"). Accordingly, the Court should find that 5 U.S.C. § 701(a)(2) precludes review of the agency's adjudicative process because it is committed to agency discretion by law.

## IV.    Even Assuming Reviewability, Plaintiffs' Claim is Unripe.

The United States Constitution limits federal jurisdiction to cases and controversies. *See U.S. Const.*, art. III, § 2, ¶ 1.  As a threshold matter, this Court must bear in mind the doctrine of ripeness, which acts as a safeguard against premature judicial adjudications until an administrative decision has been formalized.  *See Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003); *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967).  This doctrine is particularly applicable to the USCIS and FBI in the context of national security screenings.

The Supreme Court has recognized that given the national security and international relations aspects of immigration, judicial deference to the Executive Branch is especially appropriate. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999).  Judicial review of immigration matters is narrowly circumscribed.  *See e.g., Reno v. Flores*, 507 U.S. 292 (1993). Absent constitutional constraints or compelling circumstances, an agency must be permitted to fashion its own procedures to optimize its resources to most effectively discharge its multitude of administrative responsibilities. *See Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 543 (1978).

Plaintiffs have the burden to prove subject matter jurisdiction and, in the context of ripeness, must prove the fitness of the issue for judicial decision and the hardship to the parties of withholding the Court's consideration. *See Nat'l Park Hospitality Ass'n*, 538 U.S. at 808.  The Supreme Court previously set forth five factors in these two regards: 1) whether the decision is

the agency's definitive position; 2) whether the decision has the status of law; 3) whether the decision has an immediate impact on the day-to-day operations of the party seeking review; 4) whether the decision is a purely legal question that does not require further fact development; and 5) whether immediate judicial review would speed enforcement. *See FTC v. Standard Oil*, 449 U.S. 232, 239-40 (1980).

Defendants have not completed Plaintiff's security screening process, due in part to the sheer volume of pending name check applications. Cannon Decl. ¶¶ 13-20. Defendants cannot reshuffle the applicants from those who were first in line to the agencies, to those first in line to the Courts. While 68% of name checks that are submitted are processed by the FBI within 48-72 hours, the Plaintiff's applications, sympathetically, does not fall within that category. Cannon Dec. ¶¶ 13, 22, 23. Thus Plaintiff, like thousands of other applicants in his company, must exercise patience while the national security screening process is completed. *See Vasili Rogatch v. Chertoff, Slip Copy,* 2007 WL 1160358 (D.R.I. April 17, 2007). ("While the Court may be sympathetic to Plaintiff's frustration with the length of time his application has been pending without action, this Court is without jurisdiction to grant him any relief. In short, he can do no more than be patient while he awaits an answer to his application.")

**CONCLUSION**

For the foregoing reasons, Defendants respectfully requests that the Court dismiss the complaint.

Respectfully submitted,


_____Jeffrey A. Taylor_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


_____Rudolph Contreras_____
RUDOLPH CONTRERAS, D.C. BAR #  434122
Assistant United States Attorney


_____s/Sherease Louis_____
SHEREASE LOUIS
Special Assistant United States Attorney
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
(202) 307-0895
sherease.louis@usdoj.gov

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **GARY ALLEN SORENSON,** )<br><br>              Plaintiff, )<br>      v. )<br><br>**W. RALPH BASHAM,** *et al.***,** )<br><br>              Defendants. )<br>_____ ) | Civil Action No. 07-0422 (RMC) |

**CERTIFICATE OF SERVICE**

I hereby certify that service of the foregoing Motion to Dismiss was sent by the Court's

Electronic Case Filing System, this 15th day of May , 2007 to:

Thomas K. Ragland
Maggio & Kattar, P.C.
11 Dupont Circle, N.W., Suite 775
Washington, D.C. 20036
tragland@maggio-kattar.com

                                            \_\_\_\_/s Sherease Louis_____
                                              SHEREASE LOUIS
                                              Special Assistant United States Attorney
                                              United States Attorney's Office
                                              Civil Division
                                              555 4th Street, N.W.,
                                              Washington, D.C. 20530
                                              (202) 307-0895

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Gary Allen SORENSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civ. No. 1:07-cv-00422-RMC |
| W. Ralph BASHAM, Commissioner, | ) |
| U.S. Customs and Border Protection, et al. | ) |
| | ) |
| Defendants. | ) |
| | ) |

### DECLARATION OF RICHARD J. McCABE

I, Richard J. McCabe, do hereby state and declare as follows in accordance with the provisions of 28 U.S.C. § 1746:

1. I am employed by the United States Bureau of Customs and Border Protection (USCBP) as a Chief Officer at the Champlain, New York Port of Entry. My area of primary responsibility within the Port of Champlain is overseeing immigration policy matters. In conjunction with my official duties, I have been supervising the adjudication process of non-immigrant waiver applications, made pursuant to Section 212(d)(3) of the Immigration and Nationality Act (INA), at the Port of Champlain since November 2004. I make this declaration based on my personal knowledge and my review of official documents and records maintained by USCBP.

2. Section 212(d)(3) of the INA provides that certain aliens who have been deemed inadmissible to the United States as non-immigrants may apply for advance permission to enter the U.S. See INA § 212(d)(3).

3. An application being made pursuant to INA § 212(d)(3) can be filed, in person, with "Form I-192," at a U.S. port of entry.

4. Each U.S. port of entry falls under a USCBP Office of Field Operations (Field Office). As such, each Field Office along the Canadian border is responsible for adjudicating the I-192 applications submitted by inadmissible Canadians who wish to enter the U.S., when such application is made at a port of entry under that respective Field Office's jurisdiction.

5. The U.S. ports of entry falling under the Buffalo Field Office's jurisdiction are as follows: Albany, Buffalo, Alexandria Bay, Binghamton, Trout River, Massena, Ogdensburg, Rochester, Syracuse, and Champlain, New York.

6. In November 2004, the Port of Champlain was given the responsibility for adjudicating all I-192 applications received by all of the ports of entry within the Buffalo Field Office's jurisdiction.

7. With regard to the actual I-192 application process, applicants file Form I-192, along with its corresponding fee and all other pertinent documentation, in person, at the port of entry. When an application is submitted at a port of entry within the Buffalo Field Office's jurisdiction, it is then forwarded to the Port of Champlain for adjudication.

8. Upon preliminary review of the application, a determination is made as to whether or not the application is complete and all necessary documentation has been submitted, or if more information is required from the applicant. Any requests for additional information are sent by regular first class mail to the applicant.

9.  If an application is deemed to be complete, it is then filed within the Port of Champlain to await the return of all required record checks and/or additional information/documentation, as discussed below.

10. As part of the application adjudication process, several record checks are run through various databases with regard to the applicant.  The checks include a Federal Bureau of Investigation (FBI) name check, FBI fingerprint check, and the Department of Homeland Security-managed Interagency Border Inspection System (IBIS).  Additional checks may also be run through other federal, state, or local agencies if such checks are deemed appropriate and/or necessary with regard to a particular applicant.

11.  In connection with the FBI name checks, the Port of Champlain electronically submits requests for FBI name checks to USCBP's Admissibility Review Office (ARO). It is the Port's understanding that ARO then submits the requests electronically to the FBI.

12.  Once the FBI has completed the requested name check, it is the Port's understanding that ARO is electronically notified by the FBI with the results of the check.  ARO then inputs the name check results into a USCBP database.  That database is periodically accessed by the Port of Champlain to obtain the FBI name check results for the applications in which such name checks were requested.

13.  With regard to fingerprint checks, the Port of Champlain mails the applicant's original fingerprint forms, which must be submitted in conjunction with Form I-192, to the U.S. Citizenship & Immigration Services (USCIS) office in St. Albans, Vermont. It is our understanding that USCIS then submits the fingerprints to the FBI, who runs the necessary checks to identify any criminal background of the applicant.

14. The IBIS record checks are run immediately by our officers, upon processing the application, and such query results are usually available to the officers at that same time.

15. In general, fingerprint check results are typically received within a few days. The FBI name checks are sometimes received within a few weeks, however, they are just as likely to take several months, and in some cases, well over a year.

16. Every week, Port of Champlain officers review the pending applications and resubmit FBI name check requests on those applications which have been pending for at least six (6) months.

17. In the case of Gary Allen SORENSON, USCBP's file shows that he submitted his I-192 application at the Niagara Falls port of entry on November 16, 2005.

18. Pursuant to USCBP policy, as set forth above, it was forwarded to the Port of Champlain for adjudication. The application was received by the Port of Champlain on December 29, 2005.

20. During an initial review of Mr. Sorenson's application, the reviewing officer noted that the application did not include the required fingerprint chart from the Royal Canadian Mounted Police (C-216). This fingerprint chart is one of the documents that must be submitted with a I-192 application. Thus, on January 16, 2006, a letter was sent to Mr. Sorenson requesting the missing document. In that letter, USCBP advised Mr. Sorenson that the required documentation was to be sent to USCBP no later than April 15, 2006, otherwise his application would be denied for lack of initial evidence.

21. On May 8, 2006, Mr. Sorenson's attorney responded with the required document.

4

22.  With regard to the FBI name check, the Port of Champlain submitted the request for such check to ARO on February 16, 2006.  The request was re-submitted on March 9, 2006, a third time on October 26, 2006, and a fourth time on April 30, 2007.  To date, it is our understanding that USCBP's ARO has not received a response from the FBI.

I declare under penalty of perjury that the foregoing is true and correct, upon information, knowledge, and belief.

Date: *May 10, 2007*                        *Richard S. McCabe*
                                            RICHARD J. McCABE

5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| Gary Allen SORENSON, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| W. Ralph BASHAM, Commissioner, U.S. Customs and Border Protection, et al. | ) ) ) |
| Defendants. | ) ) ) |

Civ. No. 1:07-cv-00422-RMC

### DECLARATION OF MICHAEL D. OLSZAK

I, Michael D. Olszak, do hereby state and declare as follows in accordance with the provisions of 28 U.S.C. § 1746:

1. I, Michael D. Olszak, am employed by the United States Customs and Border Protection (USCBP) as the Director of the Admissibility Review Office (ARO), in Washington, DC. My area of primary responsibility is management of the ARO. In conjunction with my official duties, I have been supervising the adjudication process of non-immigrant waiver applications, made pursuant to Section 212(d)(3)(A)(i) and Section 212(d)(3)(A)(ii) of the Immigration and Nationality Act (INA), at the Admissibility Review Office since June 2006. The ARO is currently responsible for the adjudication of all Form I-192, Application for Advance Permission to Enter as Nonimmigrant, applications filed at USCBP preclearance offices. In the future, the ARO will be absorbing all of the Agency's Form I-192 caseload and will be responsible for adjudicating all such applications submitted to the Agency. In this instant, with regard to

applications filed with the Agency at locations other than preclearance offices, for example, the various U.S ports of entry, the ARO serves as a conduit for the submission of certain required security checks to other federal agencies and/or departments.

2.  I make this declaration based on my personal knowledge and my review of official documents and records maintained by USCBP.

3.  Section 212(d)(3) of the INA provides that certain aliens who have been deemed inadmissible to the United States as non-immigrants may apply for advance permission to enter the U.S.

4.  An application being made by a Canadian citizen pursuant to INA § 212(d)(3)(A)(ii) can be filed, in person, with "Form I-192," at a U.S. port of entry.

5.  As each U.S. port of entry falls under a USCBP Office of Field Operations, (Field Office), each Field Office along the Canadian border is responsible for adjudicating the I-192 applications submitted by inadmissible Canadians who wish to enter the U.S., when such application is made at a port of entry under that respective Field Office's jurisdiction. With regard to applications made within the Buffalo Field Office's jurisdiction, such applications are forwarded to the port of entry located at Champlain, New York, for processing and adjudication.

6.  As part of the application adjudication process, several record checks are run through various databases with regard to the applicant. The checks include a Federal Bureau of Investigation (FBI) name check, FBI fingerprint check, and the Department of Homeland Security-managed Interagency Border Inspection System (IBIS). Additional checks may also be run through other federal, state or local agencies if such checks are deemed appropriate and/or necessary in a particular case.

2

7.  In connection with the FBI name checks, the Port of Champlain submits requests for FBI name checks via the ARO.

8.  The required data for FBI name clearances is received electronically by the ARO in a prescribed, preformatted spreadsheet from Champlain. The Champlain port of entry submission is processed through the ARO standard fingerprint/name check regime inasmuch as the information is electronically forwarded to the "fbinameck" e-mail box at the U.S. Citizenship and Immigration Service (USCIS).

9.  With regard to the I-192 application filed by Gary Allen SORENSON, ARO records indicate the ARO received the Champlain port of entry submission of Mr. Sorenson's pertinent biographical data required for the FBI name clearance on or about January 27, 2006. This information was electronically forwarded to the "fbinameck" email box at the USCIS on February 9, 2006.

10.  The Champlain port of entry submitted Mr. Sorenson's data to the ARO a second time on or around February 23, 2006. This information was electronically forwarded to the "fbinameck" email box at the USCIS on February 23, 2006.

11.  On or about September 16, 2006, the Champlain port of entry submitted Mr. Sorenson's data to the ARO for a third time, and the ARO electronically forwarded it to the "fbinameck" email box at USCIS on September 23, 2006.

12.  The Champlain port of entry submitted Mr. Sorenson's data to the ARO a fourth time on or about April 30, 2007, and this information was electronically forwarded to the "fbinameck" email box at the USCIS on May, 8, 2007.

13. Responses to name check requests are electronically posted by USCIS. The ARO periodically accesses the relevant database to obtain results of FBI name check requests. These responses are sometimes received by ARO within a few weeks, a few months, or in some cases, a few years.

14. As the FBI name checks are a pertinent part of the I-192 adjudication process, USCBP is not able to adjudicate such applications until such time as the FBI name check is complete.

15. As of the date of this declaration, the ARO is still awaiting a response from the FBI with regard to the name check requests submitted by the ARO pertaining to Mr. Sorenson.

I declare under penalty of perjury that the foregoing is true and correct, upon information, knowledge, and belief.

Date: 5/11/2007

MICHAEL D. OLSZAK

4

UNITED STATES DISTRICT COURT
DISTRICT OF THE DISTRICT OF COLUMBIA

GARY ALLEN SORENSON,

Plaintiff,

v.

W. RALPH BASHAM,
et al.,

Defendants.

Case No: 07-cv-422

## DECLARATION OF MICHAEL A. CANNON

Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

(1)    I am currently the Section Chief of the National Name Check Program Section at the Headquarters of the Federal Bureau of Investigation ("FBI") in Washington, D.C. I have held that position since March 7, 2005.

(2)    In my current capacity as Section Chief, I supervise the National Name Check Units. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)    Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the policy and the procedures of the United States Citizenship and Immigration Services ("USCIS"). Specifically, I am aware of the name check request for Gary Allen Sorenson, the plaintiff in this civil action.

## NATIONAL NAME CHECK PROGRAM

(4)    The National Name Check Program ("Program") has the mission of disseminating information from the FBI's Central Records System in response to requests submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign

police and intelligence agencies, and state and local criminal justice agencies. The Central Records System ("CRS") contains the FBI's administrative, personnel, and investigative files. The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower Administration. That executive order addresses personnel security issues and mandates National Agency Checks as part of the pre-employment vetting and background investigation process for prospective Government employees. The FBI performs the primary National Agency Check conducted on all United States Government employees. From this modest beginning, the Program has grown exponentially, with more and more customers seeking background information from FBI files on individuals before bestowing a privilege, such as Government employment or an appointment, a security clearance, attendance at a White House function, a "green card" or naturalization, admission to the bar, or a visa. More than 70 federal, state, and local agencies regularly request FBI name searches. In addition to serving our regular Government customers, the FBI conducts numerous name searches in direct support of the FBI's counterintelligence, counterterrorism, and homeland security efforts.

## EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(5)    The FBI's CRS enables the FBI to maintain all information which it has acquired in the course of fulfilling mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter. Certain records in the system are maintained at FBI Headquarters. Records which are pertinent to specific FBI Field Offices are mostly maintained at those Field Offices.

(6)    FBI Headquarters and each Field Division can access the CRS through the FBI's General Indices. The General Indices are arranged in alphabetical order and consist of indices on various subjects, including the names of individuals and organizations. Only the information considered pertinent, relevant, or essential for future retrieval is indexed.

2

(7)     Communications directed to FBI Headquarters from various Field Offices and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals, groups, or organizations which are listed in the case captions or titles as subjects, suspects, or victims. Searches made in the index to locate records concerning particular subjects are made by searching the name of the subject requested in the index.

(8)     The entries in the General Indices fall into two categories:

      (a)     "main" entries – entries that carry the name corresponding with the subject of a file contained in the CRS.

      (b)     "reference" entries – entries (sometimes called "cross-references") that generally only mention or reference an individual, organization, etc., that is contained in a document located in another "main" file.

(9)     In 1995, the FBI implemented the Automated Case Support ("ACS") system for its Headquarters, Field Offices, and Legal Attaches. More than 105 million records were converted from automated systems previously utilized by the FBI. The ACS system consists of the following three automated applications that support case management functions for all investigative and administrative cases:

      (a)     Investigative Case Management: This application provides the ability to open, assign, and close investigative and administrative cases as well as to set, assign, and track leads. A case is opened by the Office of Origin, which sets leads for itself and other field offices, as needed. The offices that receive the leads are referred to as Lead Offices. When a case is opened, it is assigned a Universal Case File Number, which is utilized by FBI Headquarters and all offices conducting or assisting in the investigation. Using fictitious file number "111-HQ-12345" as an example, an explanation of the Universal Case File Number is as follows: "111" indicates the classification for that specific type of investigation; "HQ" is the abbreviated form used for the Office of Origin of the investigation (in this case, FBI Headquarters); and "12345" indicates the individual case file number for that particular investigation.

      (b)     Electronic Case File: This application serves as the central electronic repository for the FBI's official text-based documents. It supports the universal serial concept, where only the creator of a document serializes it into a file, providing single source entry of serials into the

computerized system. All serials originated by the Office of Origin are maintained in the Office of Origin's case file.

(c)    Universal Index: This application, sometimes referred to as "UNI", continues the universal concepts of the ACS system by providing a complete subject/case index to all investigative and administrative cases. Only the Office of Origin is required to index. However, the Lead Offices may index additional information as needed. The Universal Index, which consists of an index of approximately 98.4 million records, functions to index names to cases, and to search names and cases for use in the FBI investigative and administrative cases. Names of individuals or entities are recorded with identifying information such as the date or place of birth, race, sex, locality, social security number, address, or date of event.

(10)    The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the investigative FBI Special Agent, the supervisor in the field division conducting the investigation, and the supervising FBI Special Agent at FBI Headquarters. The FBI does not index every name in its files, but indexes only that information considered pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this mass information, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve the mandated mission of the FBI, which is to investigate violations of federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter.

(11)    When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index. The searches seek all instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference. As previously stated, any "main" file name would be that of an individual who is, himself or herself, the subject of an FBI investigation, whereas any "reference" would be an individual whose name appears as part of an FBI investigation. For example, "references" include associates, witnesses, or conspirators. Additionally, there may be a myriad of other

4

reasons to explain why an FBI Special Agent conducting an investigation believed it important to include a particular name in the FBI's index for later recovery. The names are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with only the first and last names, first and middle names, and so on. The Program application searches names phonetically against the Universal Index records and retrieves similar spelling variations (which is especially important considering that many names in our indices have been transliterated from a language other than English).

(12)    If there is a match with a name in a FBI record, it is designated as a "Hit," meaning that the system has stopped on a possible match with the name being checked. If a search comes up with a match to a name and either a birth date or social security number, it is designated an "Ident."

## RESOLUTION RATE

(13)    Historically, approximately 68 percent of the name checks submitted by USCIS are electronically checked and returned to USCIS as having "No Record" within 48-72 hours. A "No Record" indicates that the FBI's Universal Index database contains no identifiable information regarding a particular individual. Duplicate submissions (i.e., identically spelled names with identical dates of birth and other identical information submitted while the original submission is still pending) are not checked, and the duplicate findings are returned to USCIS within 48-72 hours.

(14)    For the name check requests that are still pending after the initial electronic check, additional review is required. A secondary manual name search completed typically within 30-60 days historically identifies an additional 22 percent of the USCIS requests as having "No Record," for a 90 percent overall "No Record" response rate. The results of this 22 percent also are returned to USCIS. The remaining 10 percent are identified as possibly being the subject of an FBI record. At that point, the FBI record must be retrieved and reviewed. If the record was electronically uploaded into the FBI's ACS electronic record-keeping system, it can be reviewed quickly. If not, however, the relevant information must be retrieved from an

5

existing paper record. Review of this information will determine whether the information is identified with the request. If the information is not identified with the request, the request is closed as a "No Record" and USCIS is so notified.

    (15)   Once a record is retrieved, the FBI reviews the file for possible derogatory information. Less than one percent of USCIS's requests are identified with a file containing possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory information to USCIS.

## GROWTH OF THE NAME CHECK PROGRAM

    (16)   Prior to September 11, 2001, the FBI processed approximately 2.5 million name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the number of FBI name checks has grown. For fiscal year 2006, the FBI processed in excess of 3.4 million name checks.

## USCIS NAME CHECK REQUESTS

    (17)   In November 2002, heightened national security concerns prompted a review of the former Immigration and Naturalization Service's ("INS's") procedures for investigating the backgrounds of individuals seeking immigration benefits. It was determined that deeper, more detailed clearance procedures were required to protect the people and the interests of the United States effectively. One of the procedures identified was the FBI's name check clearance. Before November 2002, only those "main" files that could be positively identified with an individual were considered responsive to the immigration authorities name check requests. However, because that approach ran a risk of missing a match to a possible derogatory record, the FBI altered its search criteria to include "reference" files, as well. From a processing standpoint, this meant the FBI was required to review many more files in response to each individual background check request.

    (18)   In December of 2002 and January of 2003, the former INS resubmitted 2.7 million name check requests to the FBI for background investigations of all individuals with then-pending applications for immigrations benefits for which the Immigration and Nationality

Act required background investigations. Those 2.7 million requests were in addition to the regular submissions by the former INS. Currently, the FBI has returned an initial response to all 2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to those resubmitted requests indicated that the FBI had no information relating to the specific individual who was the subject of the request, approximately 16 percent – or over 440,000 – resubmitted requests indicated that the FBI may have information relating to the subject of the inquiry. The FBI is still in the process of resolving those 440,000 requests.

(19)    The FBI's processing of those 440,000 resubmissions has delayed the processing of regular submissions from USCIS. As directed by USCIS, the FBI processes name check requests on a "first-in, first-out" basis unless USCIS directs that a particular name check be expedited.

(20)    The FBI cannot provide a specific or general time frame for completing any particular name check submitted by USCIS. The processing of name checks, including those which are expedited, depends upon a number of factors, including where in the processing queue the name check lies; the workload of the analyst processing the name check; the volume of priority checks the analyst must process for, among others, military call-ups, medical emergencies, "age-outs," or immigration "lottery" winners; the number of "Hits," (i.e., possible matches) that must be retrieved, reviewed and resolved; the number of records from various Field Offices that must be retrieved, reviewed and resolved; and, more generally, the staff and resources available to conduct the checks. While the FBI is sensitive to the impact of the delays in processing name check requests, the consequence of the FBI's mission on homeland security requires that its name check process be primarily focused on providing accurate and thorough results. When the name check is completed, the FBI provides the results to USCIS as quickly as possible.

(21)    It is important to note that the FBI does not adjudicate applications for benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a summary of available information to USCIS for its adjudication process.

7

## PLAINTIFF'S NAME CHECK REQUEST

(22)    The name check request for plaintiff Gary Allen Sorenson was received by the FBI from USCIS on or about November 1, 2006, and has not been completed. The FBI is performing its check in response to USCIS's request in accordance with procedures outlined above. The results of the name check will be forwarded to USCIS in Washington, D.C., in due course, in accordance with the FBI's normal protocol.

(23)    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this ____ day of May 2007.

MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

8



*Press Office*
**U.S. Department of Homeland Security**

# Fact Sheet

April 25, 2006

## Immigration Security Checks—How and Why the Process Works

**Background**

All applicants for a U.S. immigration benefit are subject to criminal and national security background checks to ensure they are eligible for that benefit.  U.S. Citizenship and Immigration Services (USCIS), the Federal agency that oversees immigration benefits, performs checks on every applicant, regardless of ethnicity, national origin or religion.

Since 2002, USCIS has increased the number and scope of relevant background checks, processing millions of security checks without incident.  However, in some cases, USCIS customers and immigrant advocates have expressed frustration over delays in processing applications, noting that individual customers have waited a year or longer for the completion of their adjudication pending the outcome of security checks.  While the percentage of applicants who find their cases delayed by pending background checks is relatively small, USCIS recognizes that for those affected individuals, the additional delay and uncertainty can cause great anxiety.  Although USCIS cannot guarantee the prompt resolution of every case, we can assure the public that applicants are not singled out based on race, ethnicity, religion, or national origin.

USCIS strives to balance the need for timely, fair and accurate service with the need to ensure a high level of integrity in the decision-making process.  This fact sheet outlines the framework of the immigration security check process, explaining its necessity, as well as factors contributing to delays in resolving pending cases.

**Why USCIS Conducts Security Checks**

USCIS conducts security checks for all cases involving a petition or application for an immigration service or benefit.  This is done both to enhance national security and ensure the integrity of the immigration process.  USCIS is responsible for ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens by screening out people who seek immigration benefits improperly or fraudulently.  These security checks have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism.  These investigations require time, resources, and patience and USCIS recognizes that the process is slower for some customers than they would like.  Because of that, USCIS is working closely with the FBI and other agencies to speed the background check process.  However, USCIS will never grant an immigration service or benefit before the required security checks are completed regardless of how long those checks take.

**How Immigration Security Checks Work**

To ensure that immigration benefits are given only to eligible applicants, USCIS adopted background security check procedures that address a wide range of possible risk factors.  Different kinds of applications undergo different levels of scrutiny.  USCIS normally uses the following three background check mechanisms but maintains the authority to conduct other background investigations as necessary:

- **The Interagency Border Inspection System (IBIS) Name Check—**  IBIS is a multiagency effort with a central system that combines information from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues and other law enforcement concerns. USCIS can quickly check information from these multiple government agencies to determine if the information in the system affects the adjudication of the case.  Results of an IBIS check are usually available immediately.  In some cases, information found during an IBIS check will require further investigation. The IBIS check is not deemed completed until all eligibility issues arising from the initial system response are resolved.

- **FBI Fingerprint Check—**FBI fingerprint checks are conducted for many applications.  The FBI fingerprint check provides information relating to criminal background within the United States. Generally, the FBI forwards responses to USCIS within 24-48 hours.  If there is a record match, the FBI forwards an electronic copy of the criminal history (RAP sheet) to USCIS.  At that point, a USCIS adjudicator reviews the information to determine what effect it may have on eligibility for the benefit. Although the vast majority of inquiries yield no record or match, about 10 percent do uncover criminal history (including immigration violations).  In cases involving arrests or charges without disposition, USCIS requires the applicant to provide court certified evidence of the disposition. Customers with prior arrests should provide complete information and certified disposition records at the time of filing to avoid adjudication delays or denial resulting from misrepresentation about criminal history.  Even expunged or vacated convictions must be reported for immigration purposes.

- **FBI Name Checks—**FBI name checks are also required for many applications.  The FBI name check is totally different from the FBI fingerprint check.   The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement. Initial responses to this check generally take about two weeks.  In about 80 percent of the cases, no match is found.  Of the remaining 20 percent, most are resolved within six months.  Less than one percent of cases subject to an FBI name check remain pending longer than six months.  Some of these cases involve complex, highly sensitive information and cannot be resolved quickly. Even after FBI has provided an initial response to USCIS concerning a match, the name check is not complete until full information is obtained and eligibility issues arising from it are resolved.

For most applicants, the process outlined above allows USCIS to quickly determine if there are criminal or security related issues in the applicant's background that affect eligibility for immigration benefits.  Most cases proceed forward without incident.  However, due to both the sheer volume of security checks USCIS conducts, and the need to ensure that each applicant is thoroughly screened, some delays on individual applications are inevitable.  Background checks may still be considered pending when either the FBI or relevant agency has not provided the final response to the background check or when the FBI or agency has provided a response, but the response requires further investigation or review by the agency or USCIS. Resolving pending cases is time-consuming and labor-intensive; some cases legitimately take months or even

**Immigration Security Checks—How and Why the Process Works**

several years to resolve.  Every USCIS District Office performs regular reviews of the pending caseload to determine when cases have cleared and are ready to be decided.  USCIS does not share information about the records match or the nature or status of any investigation with applicants or their representatives.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **GARY ALLEN SORENSON,** | ) |
| | ) |
| Plaintiff, | ) |
| v. | )     Civil Action No. 07-0422 (RMC) |
| | ) |
| **W. RALPH BASHAM,** *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

ORDER

UPON CONSIDERATION of the ***Defendant's Motion to Dismiss and Supporting***

***Memorandum of Points and Authorities,*** any Opposition filed thereto, and the entire record

herein, for good cause shown, it is by the Court,

ORDERED that the Defendant's motion should be and is hereby granted.

SO ORDERED.


_____          _____
DATE                                              ROSEMARY M. COLLYER
                                                          UNITED STATES DISTRICT COURT JUDGE